IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Nico Coty Toscani, | ) | Case No. 8:12-cv-03244-MGL-JDA |
| a/k/a John David Leatherwood, Nico Coty | ) | |
| Tosconi, Jon D. Leatherwood, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| v. | ) | |
| | ) | |
| Dr. Paul C. Drago; Dr. John B. Mcree; | ) | |
| Warden Willie Eagleton; Major West; | ) | |
| RN Linda C. Tyler; Nurse Krystal S. Hill; | ) | |
| RN Kelly M. Morton; HCA Amy L. Smith; | ) | |
| RN Patricia D. Perry; CCC Michele D. Fox; | ) | |
| RN Lisa Neely; Sgt. Gaddy, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the Court on a motion for summary judgment filed by
Defendants. [Doc. 46.] Plaintiff is proceeding pro se and brings this civil rights action
pursuant to 42 U.S.C. § 1983. [Doc. 1.] Pursuant to the provisions of 28 U.S.C.
§ 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(d), D.S.C., this magistrate judge is
authorized to review all pretrial matters in cases filed under § 1983 and to submit findings
and recommendations to the District Court.

Plaintiff filed this action on November 8, 2012[1] against Defendants Dr. Paul C.
Drago ("Drago"), Dr. John B. Mcree ("McRee"),[2] Warden Willie Eagleton ("Eagleton"), Major

---

[1]A prisoner's pleading is considered filed at the moment it is delivered to prison authorities for
forwarding to the court. *See Houston v. Lack*, 487 U.S. 266, 270 (1988). In this case, construing the filing
date in the light most favorable to Plaintiff, this action was filed on November 8, 2012. [Doc. 1-11 (envelope
marked as received by prison mailroom on November 8, 2012).]

[2]Plaintiff first identifies McRee as "Dr. John B. Mcree" but later identifies him as "Dr. McRee." [Doc.
1.] As indicated, the Court utilizes the later identification of this Defendant, which is also the
spelling/capitalization used in Defendants' filings. [*See, e.g.*, Doc. 24 (answer).]

West ("West"), RN Linda C. Tyler ("Tyler"), Nurse Krystal S. Hill ("Hill"), RN Kelly M. Morton ("Morton"), HCA Amy L. Smith ("Smith"), RN Patricia D. Perry ("Perry"), CCC Michele D. Fox ("Fox"), RN Lisa Neely ("Neely"), and Sgt. Gaddy ("Gaddy").[3] [Doc. 1.] On February 27, 2013, Defendants filed a motion for summary judgment. [Doc. 46.] On February 28, 2013, the Court filed an Order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the summary judgment procedure and of the possible consequences if he failed to adequately respond to the motion. [Doc. 47.] Plaintiff filed a response in opposition and documents in support of his response on April 30, 2013 and May 6, 2013. [Docs. 63, 64.] Accordingly, Defendants' motion is now ripe for review.

## BACKGROUND

At all times relevant to this action, Plaintiff was an inmate of the South Carolina Department of Corrections ("SCDC") housed at Evans Correctional Institution ("Evans").[4] [*See* Doc. 1.] Plaintiff asserts claims of deliberate indifference to medical needs and deliberate indifference to safety, or a failure to protect, based on the following allegations. In May and June 2012, Gaddy remarked in front of other inmates that Plaintiff was a snitch. [*Id.* at 8 ¶ 8.[5]] On June 23, 2012, Plaintiff was stabbed by another inmate. [*Id.* at 3 ¶ 3.]

---

[3]Plaintiff also named Dr. John B. Tomarchio ("Tomarchio") as a defendant [Doc. 1], but on February 5, 2013, Plaintiff moved to withdraw Tomarchio as a defendant [Doc. 28]. On March 4, 2013, the District Court adopted this Court's recommendation to grant Plaintiff's motion to withdraw. [Doc. 49.]

[4]Plaintiff is currently an inmate in the North Carolina Department of Corrections. [Docs. 66, 67 (notices of change of address).]

[5]In another portion of the Complaint, Plaintiff provides the details of the alleged acts and omissions of Defendants in a more narrative form. [*See* Doc. 1 at 13–21.] For ease of reference, the Court cites to only the numbered paragraphs in the beginning portion of the Complaint.

After the stabbing, Eagleton refused to place Plaintiff in lock-up for protection from further assaults. [*Id.* at 7 ¶ 4.]

A few hours after the stabbing, Perry treated Plaintiff's stab wound by cleaning and bandaging the wound and giving Plaintiff a tetanus shot. [*Id.* at 3 ¶ 3.] However, Perry did not notify a doctor or initiate an emergency room visit. [*Id.*] The next day, West denied Plaintiff protective custody. [*Id.* at 7 ¶ 5.]

During a dressing change on June 27, 2012, Neely observed a hard knot in the center of the stab wound but no doctor was called. [*Id.* at 9 ¶ 11.] At a dressing change on July 7, 2012, Hill documented a hard object next to the stab wound, which was reported to McRee. [*Id.* at 9 ¶ 9.] McRee ordered that Plaintiff be monitored. [*Id.* at 3 ¶ 2.] On July 8, 2012, Plaintiff had high blood pressure, but Tyler did not send the blood pressure results to a doctor until July 13, 2012, and Drago did not respond until July 16, 2012. [*Id.* at 10 ¶ 12.] On July 9, 2012, Morton saw Plaintiff during sick call and felt an object in Plaintiff's side that moved when touched. [*Id.* at 8 ¶ 7.] Morton noted Plaintiff's pain as musculoskeletal discomfort and noted that Plaintiff would continue to be monitored. [*Id.*]

Even though Plaintiff suffered a stab wound, Tyler did not contact a doctor about an emergency room visit and did not see the need to have a doctor observe Plaintiff until Tyler noted an object was broken off in the wound. [*Id.* at 10 ¶ 12.] Seventeen days after the stabbing, Tyler asked for a x-ray, but the doctor did not show up. [*Id.*] Twenty days after the stabbing, Plaintiff went to crisis intervention suicide watch to get protection, and on July 14 and 15, 2012, Plaintiff cut his testes out to try to get emergency room help and to get away from death threats from the inmate who stabbed him. [*Id.*]

3

Plaintiff reported the stabbing to Fox, who knows the inmate who stabbed Plaintiff very well. [*Id.* at 8 ¶ 6.] Fox documented the stabbing incident but did not have Plaintiff placed in any type of protective custody. [*Id.*] Further, although Smith was aware of the stabbing incident, she did not ensure Plaintiff received proper medical care for his stab wound. [*Id.* at 9 ¶ 10.] Finally, Drago was responsible for Plaintiff's health, safety, and welfare during Plaintiff's encounters with medical staff, but Drago failed to reasonably respond to Plaintiff's serious medical need. [*Id.* at 11 ¶ 13.]

Plaintiff alleges the medical staff Defendants—McRee, Perry, Morton, Hill, Smith, Neely, Tyler, and Drago—were deliberately indifferent to Plaintiff's serious medical needs. [*Id.* at 3, 8–11, 22.] Plaintiff alleges the remaining Defendants—Eagleton, West, Fox, and Gaddy—were deliberately indifferent to Plaintiff's safety and failed to protect Plaintiff. [*Id.* at 7–8, 22.] Plaintiff seeks (1) a declaration that the acts and omissions of Defendants violated Plaintiff's rights under the United States Constitution and laws; (2) compensatory damages in the amount of $120,000 against each Defendant, jointly and severally; (3) punitive damages in the amount of $130,000 against each Defendant[6]; (4) a jury trial; (5) Plaintiff's costs of suit; and (6) any other additional relief the Court deems just, proper, and equitable. [*Id.* at 23.]

---

[6]Plaintiff complains that Defendants erroneously reported the amount of compensatory and punitive damages Plaintiff seeks as $120,000 and $130,000, respectively, and that Plaintiff actually seeks $20,000 and $30,000 in compensatory and punitive damages, respectively. [Doc. 64 at 1.] However, the Court notes the Complaint lists damages amounts of $120,000 and $130,000 [Doc. 1 at 23], and the Court has failed to locate in the record where Plaintiff requests different amounts.

4

## APPLICABLE LAW

**Liberal Construction of Pro Se Complaint**

Plaintiff brought this action pro se, which requires the Court to liberally construe his pleadings. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam); *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978); *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). Pro se pleadings are held to a less stringent standard than those drafted by attorneys. *Haines*, 404 U.S. at 520. Even under this less stringent standard, however, a pro se complaint is still subject to summary dismissal. *Id.* at 520–21. The mandated liberal construction means that only if the court can reasonably read the pleadings to state a valid claim on which the complainant could prevail, it should do so. *Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999). A court may not construct the complainant's legal arguments for him. *Small v. Endicott*, 998 F.2d 411, 417–18 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

**Requirements for a Cause of Action Under § 1983**

This action is filed pursuant to 42 U.S.C. § 1983, which provides a private cause of action for constitutional violations by persons acting under color of state law. Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Accordingly, a civil action under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

Section 1983 provides, in relevant part,

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ."

42 U.S.C. § 1983.  To establish a claim under § 1983, a plaintiff must prove two elements: (1) that the defendant "deprived [the plaintiff] of a right secured by the Constitution and laws of the United States" and (2) that the defendant "deprived [the plaintiff] of this constitutional right under color of [State] statute, ordinance, regulation, custom, or usage." *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001) (third alteration in original) (citation and internal quotation marks omitted).

The under-color-of-state-law element, which is equivalent to the "state action" requirement under the Fourteenth Amendment,

> reflects judicial recognition of the fact that most rights secured by the Constitution are protected only against infringement by governments.  This fundamental limitation on the scope of constitutional guarantees preserves an area of individual freedom by limiting the reach of federal law and avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed.

*Id.* (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 658 (4th Cir. 1998)) (internal citations and quotation marks omitted).  Nevertheless, "the deed of an ostensibly private organization or individual" may at times be treated "as if a State has caused it to be performed."  *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).  Specifically, "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private

6

behavior 'may be fairly treated as that of the State itself.'"  *Id.* (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).  State action requires both an alleged constitutional deprivation "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State . . . or by a person for whom the State is responsible" and that "the party charged with the deprivation [is] a person who may fairly be said to be a state actor."  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).  A determination of whether a private party's allegedly unconstitutional conduct is fairly attributable to the State requires the court to "begin[ ] by identifying 'the specific conduct of which the plaintiff complains.'"  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999) (quoting *Blum* v. *Yaretsky*, 457 U.S. 991, 1004 (1982)).

**Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds*, 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

8

Fed. R. Civ. P. 56(c)(1).  Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

## DISCUSSION

**Claims for Injunctive and/or Declaratory Relief are Moot**

As an initial matter, because Plaintiff is no longer incarcerated at Evans, his claims are moot to the extent he is seeking injunctive and/or declaratory relief.  *Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 248–49 (4th Cir. 2005) (holding former detainee's request for injunctive relief was moot).  Plaintiff's claims for monetary damages, however, survive his transfer from Evans, *id.*, and as public officials, Defendants are subject to suit for damages in their individual capacities[7] in a § 1983 lawsuit, *Hafer v. Melo*, 502 U.S. 21, 31 (1991); *Goodmon v. Rockefeller*, 947 F.2d 1186, 1187 (4th Cir. 1991).

**Deliberate Indifference**

Plaintiff contends Defendants were deliberately indifferent to (1) Plaintiff's serious medical needs by failing to properly treat his stab wound and (2) Plaintiff's safety by failing

---

[7]To the extent Plaintiff brings this suit against Defendants in their official capacities under § 1983 [*see* Doc. 1 at 4–6 (stating each Defendant is sued in his or her individual and official capacity)], Defendants are entitled to immunity pursuant to the Eleventh Amendment.  The Eleventh Amendment prohibits federal courts from entertaining an action against a state.  *See, e.g., Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (per curiam) (citations omitted); *Hans v. Louisiana*, 134 U.S. 1, 10–11 (1890).  Further, Eleventh Amendment immunity "extends to 'arm[s] of the State,' including state agencies and state officers acting in their official capacity," *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (alteration in original) (internal citations omitted), because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office . . . [and] is no different from a suit against the State itself," *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted).  Therefore, Eleventh Amendment immunity protects state agencies and state officials sued in their official capacity from liability for monetary damages under 42 U.S.C. § 1983.  *Id.*  As a result, to the extent Plaintiff has alleged claims for monetary damages against Defendants in their official capacities under § 1983, those claims must be dismissed because Defendants in their official capacities are entitled to immunity pursuant to the Eleventh Amendment.

to protect him before and after the stabbing incident.  [Docs. 1, 64.]  Defendants argue Plaintiff has failed to establish his claims because (1) Defendants were responsive, not indifferent, to Plaintiff's medical needs and (2) Plaintiff has failed to present evidence that Defendants wantonly and obdurately failed to take precautions for Plaintiff's safety or were deliberately indifferent to a specific known risk of harm.  [Doc. 46-1 at 2–11.]  The Court agrees with Defendants.

Deliberate indifference to a prisoner's serious medical needs or safety violates the Eighth Amendment and states a cause of action under § 1983 because deliberate indifference constitutes "the 'unnecessary and wanton infliction of pain.'"  *Gamble*, 429 U.S. at 104–05 (quoting  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)).  Deliberate indifference exists when prison officials know of a substantial risk to a prisoner's health or safety and consciously disregard that risk.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Miltier v. Beorn*, 896 F.2d 848, 851–52 (4th Cir. 1990) ("Deliberate indifference may be demonstrated by either actual intent or reckless disregard.  A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." (citation omitted)).  Within the United States Court of Appeals for the Fourth Circuit, "the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" to violate a prisoner's Eighth Amendment rights.  *Miltier*, 896 F.2d at 851.

### *Medical Needs*

To prevail on a claim of deliberate indifference to medical needs, the prisoner must demonstrate (1) his medical condition was a sufficiently serious one and (2) subjectively, the prison officials acted with a sufficiently culpable state of mind.  *Goodman v. Wexford Health Sources, Inc.*, No. 09-6996, 2011 WL 1594915, at *1 (4th Cir. Apr. 28, 2011) (quoting *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998)).  As the United States Supreme Court has explained,

> Since, we said, only the "'unnecessary *and wanton* infliction of pain'" implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege "deliberate indifference" to his "serious" medical needs.  "It is *only* such indifference" that can violate the Eighth Amendment; allegations of "inadvertent failure to provide adequate medical care," or of a "negligent . . . diagnos[is]," simply fail to establish the requisite culpable state of mind.

*Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (emphasis and alteration in original) (citations omitted).  Further, in the context of prisoner medical care, the Constitution requires only that prisoners receive adequate medical care; a prisoner is not guaranteed his choice of treatment.  *Jackson v. Fair*, 846 F.2d 811, 817 (1st Cir. 1988) (citing *Layne v. Vinzant*, 657 F.2d 468, 471 (1st Cir. 1981)); *see Russell v. Sheffer*, 528 F.2d 318, 318 (4th Cir. 1975) (citing *Blanks v. Cunningham*, 409 F.2d 220 (4th Cir.1969); *Hirons v. Director*, 351 F.2d 613 (4th Cir. 1965)) ("Prisoners are entitled to reasonable medical care."); *see also, e.g.*, *Barton v. Dorriety*, No. 9:10-cv-1362, 2011 WL 1049510, at *2 (D.S.C. Mar. 21, 2011) (citing *Jackson*, 846 F.2d at 817).  The fact that a prisoner believed he had a more serious injury or that he required better treatment does not establish a constitutional violation.  *See, e.g.*, *Russell*, 528 F.2d at 319.

Assuming without deciding that Plaintiff's alleged injury is a sufficiently serious medical condition,[8] Plaintiff has failed to establish a genuine issue of material fact remains as to whether Defendants acted with a sufficiently culpable state of mind.   First, Plaintiff acknowledges in the Complaint that Plaintiff's conditions were not ignored.  [*See, e.g.*, Doc. 1 at 3 ¶ 2 (alleging McRee consulted with a nurse by phone and ordered Plaintiff be monitored after the nurse noted an object in Plaintiff's side that moved around), 3 ¶ 3 (alleging that, after the stabbing, Perry cleaned and bandaged Plaintiff's wound and gave Plaintiff a tetanus shot), 8 ¶ 7 (alleging that, at a dressing change for the stab wound, Hill documented a hard object next to the wound and called a doctor and Drago ordered an antibiotic), 9 ¶ 11 (alleging Neely changed the dressing on the wound), 10 ¶ 12 (alleging Tyler asked a doctor to observe an object broken off in the wound, ordered an x-ray, and emailed a doctor about Plaintiff's high blood pressure).]  Plaintiff merely complains he was not provided additional treatment, such as a visit to the emergency room.  As explained above, the Constitution requires only that a prisoner receive adequate medical care; the Constitution does not mandate that a prisoner receive the medical treatment of his choice. *See, e.g.*, *Jackson*, 846 F.2d at 817.

Second, the record evidence precludes finding Defendants consciously disregarded a known substantial risk to Plaintiff's health or safety.  Plaintiff's medical records show he reported to medical on June 23, 2012 complaining of being stabbed in his right lower side. [Doc. 46-3 at 3.]  Perry noted a right lower side puncture wound that was approximately

---

[8]"A medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990) (citing *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3rd Cir. 1987); *Hendrix v. Faulkner*, 525 F. Supp. 435, 454 (N.D. Ind.1981)).

one centimeter by one centimeter in size and that did not require sutures.  [*Id.*]  Perry cleaned the wound with soap and water, making sure that dirt and foreign bodies were removed, and applied a thin layer of ointment and a loose sterile bandage.  [*Id.*]  Perry also administered a tetanus shot.  [*Id.*]

On June 25, 2012, Plaintiff presented to medical complaining of pain inside the puncture site.  [*Id.* at 4.]  No symptoms of internal bleeding were noted.  [*Id.*]  Drago gave a verbal order for daily dressings and a Motrin starter pack, and he advised Tyler to perform lab work.  [*Id.*; *see* Doc. 63-1 at 12 (order to report to medical dated June 25, 2012 issued for Plaintiff to report at 3:00 p.m. on June 25–30, 2012).]

On June 26, 2012, Fox met with Plaintiff for an individual mental health session. [Doc. 46-3 at 4–5.]  Fox noted Plaintiff's stab wound was near the lower part of his right side and would not be easily accessible by someone else because of Plaintiff's wheelchair. [*Id.* at 4.]  Plaintiff expressed that he would be more comfortable in a mental health dorm with available counselors and more frequent contact with doctors.  [*Id.*]  Plaintiff also visited medical that day, and the dressing was changed on his wound.  [*Id.* at 5.]

Plaintiff's wound dressing was changed again on June 27, 2012.  [*Id.*]  Neely noted the wound was still red around the edges and had a hard knot in the center, but there was no heat to the touch and no drainage.  [*Id.*]  Neely noted medical would continue to monitor the wound.  [*Id.*]

On June 28, 2012, Plaintiff's lab work was performed and the wound dressing changed.  [*Id.*]  Some blood and drainage were noted on the old bandage.  [*Id.*]  Plaintiff left medical in his wheelchair and in no apparent distress.  [*Id.*]

13

On June 29, 2012, Plaintiff complained during the dressing change that the wound area was draining yellow and was red and warm to the touch. [*Id.* at 6.] Perry noted she would forward the information to a doctor and ask about an antibiotic. [*Id.*] Drago prescribed an antibiotic. [*Id.* at 5.]

Plaintiff's lab results were received and reviewed by Tyler on June 30, 2012. [*Id.* at 6.] Drago reviewed the results and ordered that the labs be repeated in four weeks. [*Id.*] A lab referral was completed. [*Id.*]

On July 2, 2012, Plaintiff returned to medical for a dressing change. [*Id.*] Tyler noted the area had slight yellow bruising and was swollen at the top left. [*Id.*] Tyler also noted Plaintiff had not been getting his antibiotics in the morning and had not been coming for dressing changes. [*Id.*] Tyler gave Plaintiff orders to report for dressing changes and medication. [*Id.*; Doc. 63-1 at 13 (order to report to medical dated July 2, 2012 issued for Plaintiff to report on Monday through Friday at 3:00 p.m. and on Saturday and Sunday at 10:00 a.m.).] Drago added that, if Plaintiff was not taking his morning medication, a signed refusal was needed. [Doc. 46-3 at 6.]

On July 3, 2012, Tyler changed Plaintiff's wound dressing. [*Id.* at 7.] Tyler noted the area had less bruising and appear to be healing well, although the old bandage had blood on it. [*Id.*] Perry changed the dressing on July 6, 2012. [*Id.* at 8.]

At the dressing change on July 7, 2012, Hill noted a dime-sized scab had formed at the puncture site. [*Id.*] Hill also noted an internal object lateral to the puncture site that was hard and moveable. [*Id.*] Plaintiff stated the object had been there about two weeks. [*Id.*] Hill cleaned the wound but noted a dressing was not needed because the wound was

14

not open.  [*Id.*]  Hill also paged McRee for advisement and talked to McRee over the phone about a possible foreign object in Plaintiff's right side.  [*Id.*]  McRee advised that Plaintiff be monitored.  [*Id.*]

On July 8, 2012, Hill cleaned the wound site and applied antibacterial cream.  [*Id.*]  Plaintiff also reported to the blood pressure clinic, and Tyler reported Plaintiff's high blood pressure to the doctor.  [*Id.*]

On July 9, 2012, Plaintiff presented to medical complaining of pain in his lower right flank.  [*Id.* at 9.]  Morton noted slight redness of the wound site and that, when palpated, a foreign object was felt under the skin.  [*Id.*]  Morton gave Plaintiff ibuprofen and instructed him in ways to reduce back pain and to notify staff of any changes in or worsening of his condition.  [*Id.*]  Morton also noted the foreign object would continue to be monitored per McRee's advice.  [*Id.*]  Plaintiff left in no apparent distress.  [*Id.*]

On July 10, 2012, Drago ordered a starter pack of Kelfex.  [*Id.* at 8, 9.]  Tyler asked if the doctor wanted the area x-rayed, opining Plaintiff "may have placed something in that area and that is why it is not healing."  [*Id.* at 8.]  Drago ordered an x-ray of the affected area and for Plaintiff to see Drago at the next available time.  [*Id.* at 8, 9.]  The x-ray request was submitted and an order to report was issued.  [*Id.* at 8; Doc. 63-1 at 14–15 (orders to report to medical on July 11 and 12, 2012).]  The x-ray was performed that day and "no definite radiopaque foreign bodies" were identified.  [*Id.* at 9, 10; Doc. 46-4.]

On July 13, 2012, Plaintiff was placed on crisis intervention after expressing a desire to cut himself because (1) he had been accused of stabbing himself but that is not what happened and (2) security had been picking on him.  [Doc. 46-3 at 10.]  He was placed in

15

a stripped out cell without clothing or property.  [*Id.*]  His crisis intervention plan also included observations by security every fifteen minutes, he was allowed only finger foods, and he was to be followed by medical and counselors.  [*Id.*]  On July 14, 2012, Plaintiff cut his left gonad out of pocket in what was documented as an attempt to get what he wanted,[9] and he was taken to the hospital for treatment.  [*Id.* at 11; Doc. 46-6 at 1–3 (hospital records).]  Plaintiff removed sutures and steristrips from this wound in further attempts to manipulate staff.  [Doc. 46-3 at 11–13; Doc. 46-6 at 4 (documenting hospital visit on July 15, 2012).]

On July 15, 2012, Plaintiff was transferred to the infirmary at Kirkland for evaluation for transfer to Gilliam Psychiatric Hospital ("Gilliam").  [Doc. 46-3 at 13–14.]  On July 16, 2012, an x-ray was taken of Plaintiff's abdomen, and he was taken to the hospital for removal of ingested metal.[10]  [*Id.* at 14–15.]  A sharp plastic object was removed from his right side.  [*Id.* at 15–16.]  Plaintiff was admitted to Gilliam on July 18, 2012.  [*Id.* at 16.]

Thus, the evidence shows Plaintiff was provided treatment for his ailments.  A claim of deliberate indifference to serious medical needs requires a greater showing than Plaintiff

---

[9]In his response in opposition, Plaintiff explains that his

> actions of self-mutilation [were] to keep from being placed back on the yard after assailant made threats of sending him out in a body bag.  Self preservation by way of Crisis Intervention and the only way plaintiff could get proper medical attention to a broken off knife in his side was to do something so extreme that they had to take action.

[Doc. 64 at 6.]

[10]Plaintiff ingested a razor blade.  [Doc. 46-3 at 19 ("Also states may have a razor in colon."); Doc. 46-7 at 1–2, 4 (indicating various reports by Plaintiff including (1) he swallowed a razor blade wrapped in toilet paper three days earlier, (2) he swallowed a razor blade four days earlier, and (3) he swallowed a razor blade wrapped in a condom catheter approximately three days earlier).]  He denied any acute abdominal pain and denied nausea, vomiting, and diarrhea.  [Doc. 46-7 at 1, 4.]  Hospital described his complaints, "including stab wound to the right flank nearly a month ago, chronic left testicular wound status post repair, as well as a recent history of swallowing razor blades," as minor.  [*Id.* at 5.]

has made here, even assuming Plaintiff's medical needs were serious and that a finding of negligence on the part of Defendants could be supported by the evidence.  *See Daniels v. Williams*, 474 U.S. 327, 328 (1986) (holding the Due Process Clause is not implicated by a negligent act by a prison official that causes an unintended loss of or injury to life, liberty, or property); *Gamble*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").  Accordingly, Plaintiff has failed to demonstrate a genuine issue of material fact remains as to whether Defendants were deliberately indifferent to Plaintiff's medical needs, and therefore, Defendants are entitled to summary judgment as to this claim.

### Safety

As noted, the Eighth Amendment protects inmates from physical harm at the hands of fellow inmates resulting from "the deliberate or callous indifference of prison officials to specific known risks of such harm."  *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987) (citing *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979)).  For a prison official to be liable for deliberate indifference to a prisoner's safety, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.

Here, Plaintiff has failed to demonstrate that any Defendant knew of a specific risk of harm to Plaintiff and disregarded the risk.  For example, Plaintiff alleges that, prior to the stabbing, Gaddy called Plaintiff a snitch in front of other inmates, and Plaintiff told Eagleton about Gaddy's comments.  [Doc. 1 at 8 ¶ 8.]  However, these allegations fail to show

Gaddy or Eagleton knew of a specific risk to Plaintiff's safety, i.e., the risk of Plaintiff being stabbed by another inmate.  Further, Plaintiff's comments to prison staff indicated Plaintiff was stabbed because Plaintiff refused to sell drugs for an inmate and that inmate's lover falsely accused Plaintiff of talking badly about that inmate [Doc. 46-3 at 5, 18]—not because of Gaddy's comments.  Moreover, prison staff speculated that, rather than being stabbed by another inmate, Plaintiff, who has a history of self-injurious and manipulative behavior, had stabbed himself.  [*Id.* at 4, 7, 10, 13, 16, 17; *see also id.* at 6 (noting, after a discussion between Plaintiff and a counselor that included Plaintiff's explanation of the stabbing incident, the counselor's clinical impression was malingering).]

With respect to Plaintiff's allegations that Defendants failed to protect him after the stabbing, there is no evidence that any Defendant knew of a risk to harm to Plaintiff if he was not placed in protective custody.  There is no evidence in the record that Plaintiff expressed to any Defendant or any staff at Evans fear for his safety after the stabbing incident or that a risk to Plaintiff's safety was otherwise noted.  [*See id.* at 5 (noting that, when asked three days after stabbing why he wanted to be transferred to another area, Plaintiff said he needs more counseling than once every 90 days); *cf. id.* at 6–7 ("[Plaintiff] then said that he was told that the i/m he accused was found not guilty and that the i/m can not come back to his unit.  He was ask[ed] why.  He did not answer.  He was advised to f/u with security if he was concerned about the i/m coming back to the unit."), 14 (stating to Kirkland staff that he "wanted to get out of Evans because he feared for his life"), 17 (stating to Gilliam staff that he cut himself "to get someone to move him out of Evans for his safety as nothing else worked"). ]  Further, Plaintiff has indicated the inmate who stabbed him was placed in lock-up and that the inmate was found not guilty of stabbing

18

Plaintiff. [Doc. 1-2 at 2; Doc. 64 at 2.] Plaintiff has failed to present anything more than his bare allegations that Defendants were aware of a risk to Plaintiff's safety after the stabbing. Therefore, Plaintiff has failed to demonstrate a genuine issue of material fact remains as to whether Defendants were deliberately indifferent to Plaintiff's safety, and Defendants' motion should be granted as to this claim.[11]

**Qualified Immunity**

Defendants also argue they are entitled to qualified immunity. [Doc. 46-1 at 11–12.] The Court agrees.

---

[11]To the extent Plaintiff has alleged a claim against any Defendant under a theory of supervisory liability [*see, e.g.*, Doc. 1 at 4 ¶¶ 4, 7 (alleging Drago and Eagleton had supervisory responsibilities)], such claim should be denied. Because there is no doctrine of respondeat superior in § 1983 claims, *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691–94 (1978), a defendant is liable in his individual capacity only for his personal wrongdoing or supervisory actions that violated constitutional norms, *see Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (setting forth elements necessary to establish supervisory liability under § 1983). A plaintiff must establish three elements to prevail under § 1983 on a theory of supervisory liability:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices[]"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* (citations omitted); *see also Jones v. Corr. Care Solutions*, No. 0:09-cv-269, 2010 WL 2639788, at *2 (D.S.C. June 7, 2010) (noting that, under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), supervisory liability may no longer be a viable § 1983 claim).

Here, Plaintiff has failed to demonstrate sufficient facts to establish any of the three necessary parts of a supervisory liability claim. First, Plaintiff failed to show Defendants had actual or constructive knowledge of a pervasive risk of harm to Plaintiff. As discussed above, Plaintiff has failed to establish that his constitutional rights were violated; therefore, there was no pervasive risk of harm of which Defendants should have been aware. Second, Plaintiff has failed to show Defendants acted with deliberate indifference with respect to Plaintiff's medical needs or safety. Also as discussed, Plaintiff's medical needs were addressed by medical personnel, and, although Plaintiff may disagree with the treatment he received, Defendants were not deliberately indifferent to Plaintiff's medical needs. Finally, Plaintiff has failed to establish a causal link between any inaction on the part of Defendants and the alleged violations of Plaintiff's constitutional rights because Plaintiff failed to demonstrate subordinates of any Defendant were deliberately indifferent to Plaintiff's medical needs or safety. Therefore, Plaintiff has failed to state a claim under a theory of supervisory liability.

Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, qualified immunity does not protect an official who violates a constitutional or statutory right of a plaintiff that was clearly established at the time of the alleged violation such that an objectively reasonable official in the official's position would have known of the right. *Id.* Further, qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To determine whether qualified immunity applies, a court must determine "'whether the plaintiff has alleged the deprivation of an actual constitutional right at all[ ] and ... whether that right was clearly established at the time of the alleged violation.'" *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citing *Harlow*, 457 U.S. at 819). For purposes of this analysis, a right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640.

District court and court of appeals judges are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be

20

addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  If a court decides in the negative the first prong it considers—i.e., the court decides the plaintiff has not alleged the deprivation of an actual constitutional right or the right was not clearly established at the time of the alleged violation—the court need not consider the other prong of the qualified immunity analysis. *See id.* at 243–45; *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir. 1991) (holding the court "need not formally resolve" the constitutional question of "whether the [plaintiffs] were arrested without probable cause" to address the plaintiffs' § 1983 claim; the court stated that it "need only determine whether [the defendant]—a deputy sheriff performing within the normal course of his employment—acted with the objective reasonableness necessary to entitle him to qualified immunity").

As discussed, Plaintiff's allegations fail to demonstrate Defendants violated Plaintiff's constitutional rights. Therefore, Defendants are entitled to qualified immunity.

## CONCLUSION

Wherefore, based upon the foregoing, the Court recommends Defendant's motion for summary judgment be GRANTED.

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

July 12, 2013
Greenville, South Carolina

21